FILED IN THE
U.S. DISTRICT COURT
EASTERN DISTRICT OF WASHINGTON

May 08, 2024

SEAN F. McAVOY, CLERK

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF WASHINGTON

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>      Plaintiff,<br><br> v.<br><br>OMAR AGUILAR-CRUZ,<br><br>      Defendant. | No. 4:23-cr-06024-MKD<br><br>ORDER DENYING DEFENDANT'S MOTION TO DISMISS INDICTMENT<br><br>**ECF No. 44** |

  Before the Court is Defendant Omar Aguilar-Cruz's Motion to Dismiss Indictment, ECF No. 44.  On April 5, 2024, the Court held a hearing on the motion.  ECF No. 61.  AUSA Laurel Holland appeared on behalf of the United States.  AFD Nick Mirr appeared on behalf of the Defendant.

  Defendant is charged with one count of unlawful possession of a firearm, in violation of 18 U.S.C. § 922(g)(1).  ECF No. 1 at 1.  Defendant moves to dismiss the charge against him on constitutional grounds.  ECF No. 44.  The Court has heard from counsel, considered the parties' arguments, the briefing, and the record, and is fully informed.  For the reasons below, Defendant's Motion is denied.

ORDER – 1

## BACKGROUND

The Indictment alleges that on or about April 22, 2023, Defendant knowingly and intentionally possessed a Hi-Point C9 handgun, while knowing his status as a person previously convicted of a crime punishable by imprisonment for a term exceeding one year, in violation of 18 U.S.C. § 922(g)(1).  ECF No. 1 at 1.

For purposes of Defendant's Motion, he does not dispute that he has been convicted of an offense punishable by a term of imprisonment exceeding one year. ECF No. 44 at 4.  The record indicates that, on March 1, 2010, Defendant pled guilty to one count of assault in the second degree with a deadly weapon enhancement and was sentenced to 15 months imprisonment.  ECF No. 47-3.  On August 27, 2013, Defendant pled guilty to two counts of robbery in the first degree, for which he was sentenced to 77 months of imprisonment.  ECF No. 47-2.

## LEGAL STANDARD

Fed. R. Cr. P. 12(b) provides that: "[a] party may raise by pretrial motion any defense, objection, or request that the court can determine without a trial on the merits."  The Court may resolve a motion to dismiss an indictment before trial "if it involves questions of law rather than fact."  *United States v. Shortt Accountancy Corp.*, 785 F.2d 1448, 1452 (9th Cir. 1986).

**DISCUSSION**

Defendant argues that 18 U.S.C. § 922(g)(1) violates the Second Amendment following the Supreme Court's decision in *New York State Rifle & Pistol Assn. v. Bruen*, 597 U.S. 1 (2022), both facially and as applied to him. ECF No. 44 at 3, 22. Section 922(g)(1) provides as follows:

> It shall be unlawful for any person . . . who has been convicted in any court of, a crime punishable by imprisonment for a term exceeding one year . . . to . . . possess in or affecting commerce, any firearm or ammunition; or to receive any firearm or ammunition which has been shipped or transported in interstate or foreign commerce.

18 U.S.C. § 922(g)(1). Penalties for violating Section 922(g)(1) include a fine and imprisonment for not more than 15 years. 18 U.S.C. § 924(a)(8).

The Second Amendment states: "A well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed." U.S. Const. amend. II. In *District of Columbia v. Heller*, the Supreme Court clarified that the Second Amendment right is "an individual right to keep and bear arms[,]" and that "self-defense" is "the central component of the right[.]" 554 U.S. 570, 595, 599 (2008). *Bruen* clarified the test for Second Amendment challenges to firearm regulations. 597 U.S. at 17. The Ninth Circuit explains the test as follows:

> We first consider whether the Second Amendment's plain text covers an individual's proposed course of conduct. . .

ORDER – 3

> . .  If so, the Second Amendment presumptively protects
> that conduct.
> . . .
> The Government then bears the burden of justifying the
> challenged regulation by showing that it is consistent with
> our nation's historical tradition of firearm regulation. . . .
> Only then may we conclude that the regulation is
> constitutional.

*United States v. Perez-Garcia*, 96 F.4th 1166, 1178 (9th Cir. 2024) (citing *Bruen*,

597 U.S. at 24).  Defendant's Second Amendment challenge to Section 922(g)(1)

is based on this two-step analysis.  ECF No. 44 at 17-22.

Initially, the Ninth Circuit has deemed Section 922(g)(1) constitutional.

*United States v. Vongxay*, 594 F.3d 1111, 1114-16 (9th Cir. 2010).  Since that

decision, no controlling authority has declared otherwise.[1]  A straightforward

application of relevant authority would require that Defendant's motion be denied.

*See Close v. Sotheby's, Inc.*, 894 F.3d 1061, 1073 (9th Cir. 2018) (citation omitted)

("So long as the court can apply [the] prior circuit precedent without running afoul

---

[1] In *United States v. Whitney*, an unreported memorandum decided April 3, 2024,

the Ninth Circuit again found that Section 922(g)(1) "is facially constitutional" and

explained that *Bruen* does not cast doubt on its constitutionality.  No. 22-10326,

2024 WL 1429461, at *2 (9th Cir. Apr. 3, 2024).  The Court recognizes the

unpublished decision is not binding precedent.  *See Grimm v. City of Portland*, 971

F.3d 1060, 1067 (9th Cir. 2020).

ORDER – 4

1   of the intervening authority it must do so.").  As a fellow district court of this

2   Circuit has observed, "every district court within the Ninth Circuit since *Bruen* has

3   upheld the constitutionality of § 922(g)(1)."  *United States v. Torres*, No. 1:23-CR-

4   219, 2024 WL 1555399, at *1-2 (D. Idaho Apr. 10, 2024).  *Bruen*'s test, applied

5   here, also requires that the Court deny Defendant's motion.

6   **A. Plain Text of the Second Amendment**

7       The plain text of the Second Amendment has three components: "the right of

8   [1] the people [2] to keep and bear [3] Arms . . . ."  U.S. Const. amend. II; *see*

9   *Heller*, 554 U.S. at 579-92.  Although the meaning of the Second Amendment is

10  "historically fixed," its protections "appl[y] to new circumstances."  *Bruen*, 597

11  U.S. at 28.

12      *1.  "To Keep and Bear" and "Arms"*

13      The parties do not dispute that Section 922(g)(1) implicates the right to keep

14  and bear arms.  Section 922(g)(1) prohibits possession of any firearm anywhere,

15  even in the home for self-defense, necessarily implicating the Second

16  Amendment's plain text.  *See Perez-Garcia*, 96 F.4th at 1180-81.  Further, the

17  weapon Defendant is accused of possessing is a handgun, which *Bruen* explicitly

18  acknowledges is encompassed in the Second Amendment's plain text.  *Bruen*, 597

19  U.S. at 47.  Therefore, Section 922(g)(1) unquestionably implicates the right "to

20  keep and bear arms."

1

*2.  "The People"*

2        The parties disagree whether Defendant is among "the people" as the term is

3    used in the Second Amendment's plain text, in light of his status as a convicted

4    felon.  ECF No. 44 at 18; ECF No. 47 at 23.

5        The *Heller* Court explained that "the people" "refers to a class of persons

6    who are part of a national community or who have otherwise developed sufficient

7    connection with this country to be considered part of that community."  554 U.S. at

8    580 (quoting *United States v. Verdugo-Urquidez*, 494 U.S. 259, 265 (1990)).  The

9    *Heller* Court explained that the Second Amendment right "is exercise[d]

10   individually and belongs to all Americans."  *Heller*, 554 U.S. at 581.  In *Bruen*, the

11   petitioners were "part of 'the people'" because there was no dispute they were

12   "ordinary, law-abiding, adult citizens."  *Bruen*, 597 U.S. at 31.  It is well-settled

13   that the Second Amendment's plain text refers to law-abiding citizens.  *See, e.g.*,

14   *Heller*, 554 U.S. at 625, 635; *Bruen*, 597 U.S. at 10, 15, 26, 29-31, 38, 60, 70-71.

15   This case presents a separate question: whether the Second Amendment's plain

16   text also refers to citizens who have not abided the law.

17       Pre-*Bruen* authority has discussed the Second Amendment rights of felons.

18   The *Heller* Court explained that "nothing in our opinion should be taken to cast

19   doubt on the longstanding prohibitions on the possession of firearms by felons[.]"

20   554 U.S. at 626-27.  In *Vongxay*, the Ninth Circuit applied this language to explain

that "felons are categorically different from the individuals who have a fundamental right to bear arms[.]"  594 F.3d at 1115.  Six years later, the Ninth Circuit reaffirmed *Vongxay*, though observing that "there are good reasons to be skeptical of the constitutional correctness of categorical, lifetime bans on firearm possession by all 'felons.'"  *United States v. Phillips*, 827 F.3d 1171, 1174 (9th Cir. 2016).[2]

       After *Heller* and *Vongxay*, the circuit courts developed a two-step burden-and-scrutiny inquiry, which the Ninth Circuit adopted in 2013.  *United States v. Chovan*, 735 F.3d 1127, 1136-37 (9th Cir. 2013) ("We join the Third, Fourth, Seventh, Tenth, and D.C. Circuits in holding that the two-step framework outlined above applies to Second Amendment challenges.").  That inquiry first asked whether a regulation burdened the Second Amendment right, then applied the appropriate level of scrutiny to determine whether the Second Amendment would tolerate it.  *Id.* at 1137.  *Bruen* abrogated that test, finding that "[s]tep one of the predominant framework is broadly consistent with *Heller*," but step two was not.  *Bruen*, 597 U.S. at 19.

---

[2] Rather than take up the issue, however, *Phillips* instructed that the appellant's "remedy . . . is to seek rehearing en banc."  827 F.3d at 1174 n.1, *reh'g en banc denied*, No. 14-10449 (9th Cir. July 20, 2016), *cert. denied*, 583 U.S. 829 (2017).

1    This Court does not interpret the *Vongxay* Court's comment that felons are

2    "categorically different" as an application of the Second Amendment's plain text

3    as to "the people."  The Ninth Circuit does not claim to undertake a textual

4    analysis.  594 F.3d at 1115.  Instead, the holding was derived from *Heller*'s list of

5    "presumptively lawful regulatory measures."  *Id.* (quoting 554 U.S. at 627 n.26).

6    As the *Bruen* Court explained, the list illustrates types of regulations that are

7    constitutional under the Second Amendment; it does not define its plain text as to

8    "the people."  597 U.S. at 21.  Elsewhere in *Vongxay*, the Ninth Circuit suggests

9    that felons have Second Amendment rights.  594 F.3d at 1117 ("even given the

10   Second Amendment's individual right to bear arms, felons' Second Amendment

11   rights can be reasonably restricted.").

12        The Court understands the Ninth Circuit's ultimate holding in *Vongxay* as

13   not defining "the people," but as deciding whether Section 922(g)(1)

14   impermissibly burdened the Second Amendment right.  Felons are "categorically

15   different" from other citizens, but not necessarily because they are excluded from

16   "the people."  *Id.* at 1114-18.  Instead, felons may be considered categorically

17   different because, as explained below, "the Nation's historical tradition of firearm

18   regulation" treats them differently.  *Bruen*, 597 U.S. at 17.

19

20

Returning to *Perez-Garcia*[3] and *Heller*, reasonable minds could disagree as to whether a felon is "part of [our] national community or [] have otherwise developed sufficient connection with this country to be considered part of that community." *Perez-Garcia*, 96 F.4th at 1178-79 (quoting *Heller*, 554 U.S. at 580).

The pretrial releasees in *Perez-Garcia* "remain[ed] members of the national community." 96 F.4th at 1180. In particular, because those appellants had not been found guilty. *Id.* ("to allow the government to exclude an entire group of individuals from "the people" through mere accusation would be, at minimum, inconsistent with the presumption of innocence."). The Ninth Circuit also reaffirmed that "at least one group of misdemeanants—specifically, domestic violence misdemeanants—is 'entitled to some measure of Second Amendment protection.'" *Id.* (quoting *Chovan*, 735 F.3d at 1137).

The Ninth Circuit in *Perez-Garcia* discussed felons only tangentially, finding no Supreme Court case excluding felons from "the people." *Id.* More broadly, the Ninth Circuit observed that "even convicted persons serving their

---

[3] *Perez-Garcia* was decided after the parties completed the instant briefing. 96 F.4th 1166. The parties did not have the opportunity to brief the case, but were instructed to be prepared to discuss the case at the hearing, and they had the opportunity to present argument related to the new authority. ECF No. 60.

sentences enjoy freedoms of speech and religion under the First and Fourteenth Amendments, as well as equal protection and due process protection." *Id.* To define "the people," the *Heller* Court cited to a prior case that discussed the Fourth, First, and Second Amendments together. 554 U.S. at 580 (quoting *Verdugo-Urquidez*, 494 U.S. at 265). The United States argues in the opposite—that the Second Amendment's "people" are different than those referred to in the First or Fourth Amendment. ECF No. 47 at 24 ("[T]he term 'people' need not have the same meaning in the Second Amendment that it does in the First and Fourth Amendments."). This position was in doubt under *Heller*, and likely foreclosed in this Circuit under *Perez-Garcia*.

The United States asserts that the Second Amendment's plain text does not concern felons because they are excluded from the national community and thereby lose a number of "political rights." ECF No. 47 at 23-27. This reading of the Second Amendment is difficult to reconcile with *Heller*'s finding that "the people" is used consistently throughout the Constitution when discussing rights. 554 U.S. at 579-80.

Finally, the United States offers evidence from history, including the English Bill of Rights and constitutional proposals, for its position on the plain text. ECF No. 47 at 25-26. To the extent the evidence should be considered in the textual analysis, it tends to defeat the United States' position rather than support it. For

example, the constitutional proposals contemplate that the right to keep and bear arms may be curtailed for actual rebellion, non-peaceable behavior, or crimes committed, but none purport to exclude bad actors from the definition of "the people." *Id.* at 25-27 (citations omitted). To the contrary, because these proposals provide for exceptions to who receives protection, "the people" inferentially refers to the broader category of persons, including rebels or criminals. *Id.* The Court agrees that the evidence is appropriate for consideration—though at *Bruen*'s step two.

The United States' rather broad position is that felons have no standing to challenge any regulation under the Second Amendment. *Id.* The term "felon" has little or no constitutional significance. *See Kanter v. Barr*, 919 F.3d 437, 459 (7th Cir. 2019) (Barrett, J., dissenting) ("the definition of 'felony' was difficult to pin down at the time of the founding."). Further, the Second Amendment is broader than Section 922(g)(1). The United States' position would deprive felons of the right to use arms for self-defense other than firearms. *See Teter v. Lopez*, 76 F.4th 938 (9th Cir. 2023), *vacated, reh'g en banc granted*, 93 F.4th 1150 (9th Cir. Feb. 22, 2024) (knives); *Caetano v. Massachusetts*, 577 U.S. 411, 411-12 (2016) (stun guns). Moreover, Section 922(g)(1) may change one day. Congress could legislate that temporary, rather than permanent, disarmament should follow from a felony. If it did, under the United States' position, a felon would have no ability

bring a Second Amendment challenge even after a term of temporary disarmament because the Second Amendment does not concern felons.  As then-Judge Amy Coney Barrett concluded in 2019, "[t]hat is an unusual way of thinking about rights." *Kanter*, 919 F.3d at 452.  Comparing voting rights, for example, "a state can disenfranchise felons, but if it refrains from doing so, their voting rights remain constitutionally protected." *Id.*  Similarly, a state (or the federal government) may limit a felon's right to keep and bear arms, but in the absence of such regulation, the right remains.  *Id.*  It is more conceptually sound to ask whether the Second Amendment allows a modern regulation, rather than attempt to define the Second Amendment's text in light of the modern regulation.  *Id.*

The Second Amendment's plain text protects the rights of "the people," and there is no textual exclusion to that right based upon felony conviction.  Defendant is therefore afforded a presumption that he is entitled to possess a firearm, even as a felon.  Importantly, that does not mean that he has the right to possess a firearm.  The Court turns to the scope of the Second Amendment right pursuant to *Bruen*'s history and tradition test.  597 U.S. at 25.

**B. Historical Tradition of Regulation**

Because "[t]he Second Amendment's plain text presumptively guarantees" Defendant's right to possess firearms, the United States must demonstrate that Section 922(g)(1) comports with "the Nation's historical tradition of firearm

regulation." *Bruen*, 597 U.S. at 24, 33.  The Supreme Court and the Ninth Circuit have discussed Section 922(g)(1)'s context in this historical tradition.  Outside of citation to authority, the United States also offers historical analogs to demonstrate Section 922(g)(1)'s consistency with the Second Amendment right.

### 1. Longstanding Regulatory Measures

*Heller*, *Bruen*, and pre- and post-*Bruen* Ninth Circuit authority suggest that Section 922(g)(1) is within the Nation's historical tradition of firearms regulation.

*Heller* emphasized that it should not be read to "cast doubt on such longstanding regulatory measures as prohibitions on the possession of firearms by felons[.]"  554 U.S. at 636.  The Supreme Court "repeat[ed] those assurances" in *McDonald v. City of Chicago*, 561 U.S. 742, 786 (2010).  The *Bruen* majority broadly endorsed *Heller*'s list of other "longstanding laws."  597 U.S. at 30 (quotation marks omitted).  Justices Brett Kavanaugh and John Roberts wrote separately in concurrence to "underscore" *Heller*'s "longstanding prohibitions[,]" including felon-in-possession regulations.  597 U.S. at 80-81 (reiterating that "properly interpreted, the Second Amendment allows a variety of gun regulations[.]") (quotation marks omitted).

The Ninth Circuit in *Perez-Garcia* relied on this same language, extending it to support "a historical tradition of disarming individuals who are not law-abiding, responsible citizens."  96 F.4th at 1177-78 (quotation marks omitted).  As

explained above, before *Bruen*, the Ninth Circuit relied on this language to uphold Section 922(g)(1).  *Vongxay*, 594 F.3d at 1118; *Phillips*, 827 F.3d at 1174.  The *Vongxay* court also cited to "scholars of the Second Amendment" to conclude that "the right to bear arms does not preclude laws disarming the unvirtuous citizens (i.e. criminals)," though recognizing that "the historical question has not been definitively resolved."  594 F.3d at 1118 (quoting Don B. Kates, Jr., *The Second Amendment: A Dialogue*, 49 Law & Contemp. Probs. 143, 146 (1986)).

Controlling Ninth Circuit and Supreme Court case law therefore hold that the Nation's historical tradition of firearms regulation would permit Section 922(g)(1).

*2. History and Tradition*

Separately, the United States has provided sufficient historical analogue to meet its burden under the second prong of *Bruen*.

For firearms regulations addressing a "general societal problem that has persisted since the 18th century," the historical analysis is "fairly straightforward." *Bruen*, 597 U.S. at 26.  The means by which "earlier generations addressed the societal problem," or their inaction on it, are relevant evidence of whether a modern regulation targeting that same problem is constitutional.  *Id.* at 26-27.

However, "other cases implicating unprecedented societal concerns or dramatic technological changes may require a more nuanced approach." *Id.* at 27.

"When confronting such present-day firearm regulations, this historical inquiry that courts must conduct will often involve reasoning by analogy[.]" *Id.* at 28. In particular, "how and why the regulations burden a law-abiding citizen's right to armed self-defense[,]" as compared to past regulations. *Id.* at 29. "[W]hether modern and historical regulations impose a comparable burden on the right of armed self-defense and whether that burden is comparably justified are 'central' considerations when engaging in an analogical inquiry." *Id.*

As to the "how," Section 922(g)(1) "imposes a heavy burden on [Defendant's] rights to bear arms because it prohibits them from possessing or attempting to possess any firearm." *Perez-Garcia*, 96 F.4th at 1181. It reaches the "core" of the right: possession of a handgun in the home for self-defense. *Heller*, 554 U.S. at 630. Importantly, Section 922(g)(1) does not burden the right blindly or wantonly; it only applies to those convicted of crimes punishable by imprisonment more than one year. Presumably, the individuals subject to Section 922(g)(1)'s prohibition were afforded due process and pleaded or were found guilty. *See Perez-Garcia*, 96 F.4th at 1181-82 (upholding a regulation disarming pretrial releasees, in part because "the condition is imposed only upon individualized consideration by a judicial officer.").

As to the "why," it is perhaps obvious that Section 922(g)(1) aims to keep individuals with demonstrated criminal histories from possessing firearms. As past

case law has observed, Section 922(g)(1) and its related provisions are a packet of legislation passed in 1938, 1961, and 1968. *Phillips*, 827 F.3d at 1174 n.2; *Barrett v. United States*, 423 U.S. 212, 220 (1976). Regarding the 1938 Act, the Supreme Court explained it "was designed to prevent the crook and gangster, racketeer and fugitive from justice from being able to purchase or in any way come in contact with firearms of any kind." *Barrett*, 423 U.S. at 220. The 1968 Act "reflects a similar concern with keeping firearms out of the hands of categories of potentially irresponsible persons, including convicted felons." *Id.* Congress "was concerned with the widespread traffic in firearms and with their general availability to those whose possession thereof was contrary to the public interest." *Huddleston v. United States*, 415 U.S. 814, 824 (1974) (citations omitted). "The principal purpose of the federal gun control legislation, therefore, was to curb crime by keeping firearms out of the hands of those not legally entitled to possess them[.]" *Id.* (quotation marks omitted).

Lawlessness is an ancient societal problem. In *Phillips*, the Ninth Circuit observed that the "first federal statute disqualifying violent felons did not exist until 1938 and that [the] first complete federal felon ban did not exist until 1961[.]" 827 F.3d at 1174 at n.2 (citing *United States v. Skoien*, 614 F.3d 638, 640 (7th Cir. 2010) (en banc)). Therefore, Section 922(g)(1) passes constitutional muster if its

burden on the Second Amendment right, and its justification, are comparable to historical analogs.

The United States points to two categories of laws that historically support Section 922(g)(1)'s constitutionality: (1) laws disarming those deemed untrustworthy, and (2) laws authorizing capital punishment and estate forfeiture for felons. ECF No. 57 at 28.

### a. Laws Disarming Untrustworthy or Lawless Individuals

The United States provides a collection of laws that "categorically disqualified people from possessing firearms based on a judgment that certain individuals were untrustworthy parties to the nation's social compact." ECF No. 47 at 32 (citing *Folajtar v. AG of the United States*, 980 F.3d 897, 905 (3d Cir. 2020)).

The United States begins with pre-colonial English law. ECF No. 47 at 32. The Ninth Circuit has discussed this same law, explaining that the 1688-89 English Bill of Rights guaranteed rights to keep and bear arms "as allowed by law." *Perez-Garcia*, 96 F.4th at 1186-87 (citing An Act Declaring the Rights and Liberties of the Subject and Settling the Succession of the Crowne, 1 W. & M., Sess. 2, ch. 2, § 7, in 6 Statutes of the Realm 142-45 (Eng. 1688)). English law at the time condemned disarming good subjects, but "allowed the disarming of irresponsible ones." *Perez-Garcia*, 96 F.4th at 1187. "[T]his English tradition of lawful

disarmament coexisted with the fundamental right to keep and bear arms." *Id*. "Although the English Bill of Rights secured a right to possess arms, the government could—and did—disarm those who could not be trusted to use arms lawfully and responsibly." *Id*. The *Heller* Court and *Perez-Garcia* court explained that the English right is the predecessor to the Second Amendment, therefore "this background supports the view that the Second Amendment also empowers Congress to authorize the disarming of individuals who are not law-abiding, responsible citizens." *Id.* (citing 554 U.S. at 593).

The United States offers early colonial laws disarming individuals deemed untrustworthy. ECF No. 47 at 33. These individuals included slaves, the native population, and Catholics who refused to take loyalty oaths. *Id.* at 33 (citing *United States v. Jimenez-Shilon*, 34 F.4th 1042, 1047 (11th Cir. 2022); 7 The Statutes at Large; *Being a Collection of All the Laws of Virginia* 35-39 (1820) (1756 Va. Law)). The *Perez-Garcia* court looked to laws in Maryland, Virginia, Pennsylvania, Connecticut, Massachusetts, New Jersey, and North Carolina laws in the leadup to the Revolutionary War disarming the disloyal, and "[t]he justification was always that those being disarmed were dangerous." 96 F.4th at 1187.

The *Perez-Garcia* court also discussed constitutional proposals that would permit disarmament for crimes committed and real danger of public injury. *Id.* at 1188. The United States also cites to early state laws permitting the disarmament

of individuals for disloyalty or unlawfulness.  ECF No. 47 at 34-36.  These include the laws and constitutions of Connecticut, Pennsylvania, Massachusetts, and New Hampshire, among others.  *Id.*

The Court need not review every law offered in great detail and finds those discussed provide sufficient historical evidence that Section 922(g)(1) is within the Nation's historical tradition of firearms regulation.  The "how" and the "why" of these historical regulations is comparable: certain individuals cannot be trusted to possess weapons due to their actual or perceived threat of lawlessness, so the government may disarm them.  *Bruen*, 597 U.S. at 29.  As *Perez-Garcia* concluded: "the Anglo-American right to keep and bear arms for self-defense has always coexisted with legislative authority to disarm groups or individuals whose possession of firearms would pose an unusual danger, beyond the ordinary citizen, to themselves or others."  96 F.4th at 1189.

### b.  Estate Forfeiture and Capital Punishment

The United States analogizes Section 922(g)(1) with felony punishment laws, such as the forfeiture of property and rights for felons, ECF No. 47 at 28 (citing 2 William Blackstone, *Commentaries on the Laws of England* 95 (1st ed. 1769) (describing the possible punishments of serious crime as including "confiscation, by forfeiture of lands, or moveables, or both, or of the profits of lands for life …")), and capital punishment, ECF No. 47 at 28 (citing *Medina v.*

ORDER – 19

*Whitaker*, 913 F.3d 152, 158 (D.C. Cir. 2019) ("Felonies were so connected with capital punishment that it was hard to separate them.")).

The United States highlights a series of early American laws punishing serious non-violent and violent crimes with death, lashings, or forfeiture of all property. ECF No. 47 at 28-32. Felons were far more likely to face capital punishment or estate forfeiture leading up to the ratification of the Second Amendment than they are today. *See United States v. Jackson*, 69 F.4th 495, 503 (8th Cir. 2023) (explaining that "[e]arly legislatures . . . authorized punishments that subsumed disarmament—death or forfeiture of a perpetrator's entire estate— for non-violent offenses involving deceit and wrongful taking of property."); *see also Baze v. Rees*, 553 U.S. 35, 95 (2008) (Thomas, J., concurring) (recognizing the "ubiquity of the death penalty in the founding era."); *but see Kanter*, 919 F.3d at 459 (Barrett, J., dissenting) ("During the period leading up to the founding, the connection between felonies and capital punishment started to fray.").

The Ninth Circuit, in *Perez-Garcia*, recognized the severity of criminal punishment in early America. 96 F.4th at 1183-84 ("The First Congress imposed capital punishment for crimes such as forgery of United States securities and running away with a ship or vessel, or any goods or merchandise to the value of fifty dollars.") (citations omitted). There, the historical practice of detaining defendants facing capital charges before trial evidenced that disarming pretrial

ORDER – 20

defendants would be within the historical tradition of firearms regulation, as well. *Id.* ("the historical record evinces a historical tradition of complete disarmament of criminal defendants facing serious or felony charges pending trial.").

The United States argues that a parallel logic suffices for the "how" analysis, here. ECF No. 47 at 31-32. Felons in early America faced disarmament by death or estate forfeiture, therefore Section 922(g)(1), although less drastic, remains within the purported historical tradition of disarming felons. *Id.*

The "why" of these regulations is not an exact parallel of the "why" for Section 922(g)(1). Section 922(g)(1) is part of a packet of laws meant to curb firearm proliferation and the lawlessness Congress believed it would bring. *See Barrett*, 423 U.S. at 220; *Huddleston*, 415 U.S. at 824. Criminal punishments are not firearms regulations, and are not specifically aimed at preventing dangerous individuals from having weapons. *Perez-Garcia*, 96 F.4th at 1183-84. Severe punishment for serious crimes and Section 922(g)(1) do share the broad goal of protecting the community, though differ in scope and purpose.

In light of the authority on point and the other historical analogs offered above, historical laws disarming convicts through death or estate forfeiture bolsters the conclusion that Section 922(g)(1) fits within the Nation's historical tradition of firearms regulation.

c.  The United States' Burden

The *Bruen* Court explained that "analogical reasoning under the Second Amendment is neither a regulatory straightjacket nor a regulatory blank check." 597 U.S. at 30.  "[A]nalogical reasoning requires only that the government identify a well-established and representative historical analogue, not a historical twin.  So even if a modern-day regulation is not a dead ringer for historical precursors, it still may be analogous enough to pass constitutional muster."  *Id.*

The United States has carried its burden to show that Section 922(g)(1) comports with this country's history and tradition of firearms regulation.  Section 922(g)(1) "is a clear exercise of Congress' historical legislative power to disarm those who are judged to be a threat to the public safety."  *Perez-Garcia*, 96 F.4th at 1189.  Section 922(g)(1) "does not broadly prevent law-abiding citizens with ordinary self-defense needs from exercising their right to keep and bear arms."  *Id*. The historical evidence demonstrates that the Second Amendment tolerates a regulation dispossessing those convicted of serious crimes of their firearms.

**C. Defendant's As-Applied Challenge**

Unlike a facial challenge, an as-applied challenge challenges the application of a particular law to the parties before the court.  *Young v. Hawaii*, 992 F.3d 765, 779 (9th Cir. 2021).  Defendant concedes for the purposes of his motion that he has been convicted of an offense punishable by a term of imprisonment exceeding one

year.  ECF No. 44 at 4.  The record indicates these convictions were guilty pleas for second degree assault with a deadly weapon and first degree robbery.  ECF Nos. 47-2, 47-3.

Defendant's as-applied challenge is targeted primarily at the notion he should be considered among "the people" for Second Amendment purposes given his particular circumstances.  *See* ECF No. 59 at 13.  The Court finds he is among "the people," above.  However, Section 922(g)(1) is a regulation within the historical tradition of firearms regulations, and the prohibition on his possession of a firearm, with criminal penalties, is constitutional.

Other than that discrete issue, his challenge is primarily a facial one.  *Young*, 992 F.3d at 779 ("A facial challenge is a claim that the legislature has violated the Constitution, while an as-applied challenge is a claim directed at the execution of the law.").  As explained above, Section 922(g)(1) is constitutional as written. Defendant's as-applied and facial challenges fail.

## CONCLUSION

Pursuant to the relevant preexisting authority and after an application of *Bruen*, Defendant cannot demonstrate that Section 922(g)(1) is unconstitutional, either as applied to him or facially.  For the reasons stated herein, his motion is denied.

Accordingly, **IT IS HEREBY ORDERED:**

1.      Defendant's Motion to Dismiss Indictment, **ECF No. 44**, is **DENIED.**

**IT IS SO ORDERED.**  The Clerk's Office is directed to enter this Order and provide copies to all counsel.

**DATED** May 8, 2024.

<u>s/Mary K. Dimke</u>
MARY K. DIMKE
UNITED STATES DISTRICT JUDGE

ORDER – 24